# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID YAMRUS, derivatively on behalf of STANLEY BLACK & DECKER, INC., | Civil Action No. |
| Plaintiff, | |
| v. | |
| JOHN F. LUNDGREN, DONALD ALLAN, JR., JEFFREY D. ANSELL, JAMES M. LOREE, NOLAN D. ARCHIBALD, JOHN G. BREEN, GEORGE W. BUCKLEY, PATRICK D. CAMPBELL, CARLOS M. CARDOSO, VIRGIS W. COLBERT, ROBERT B. COUTTS, MANUEL F. FERNANDEZ, BENJAMIN H. GRISWOLD, IV, EILEEN S. KRAUS, ANTHONY LUISO, MARIANNE MILLER PARRS, ROBERT L. RYAN and LAWRENCE A. ZIMMERMAN, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | **MAY 11, 2012** |
| STANLEY BLACK & DECKER, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.     This is a verified shareholder derivative action on behalf of nominal defendant Stanley Black & Decker, Inc. ("Stanley" or the "Company") against Stanley's Board of Directors (the "Board") and certain of Stanley's current and former executive officers.  This action seeks to hold defendants liable for breach of their fiduciary duties of candor, good faith and loyalty, unjust enrichment, and aiding and abetting from 2010 to the present (the "Relevant Period") in connection with the award of excessive and unwarranted 2010 executive compensation.

## NATURE OF THE ACTION.

2.      This is a failed "say on pay" shareholder derivative action, arising from the Board's unwarranted and excessive spending of Company (*i.e.*, stockholders') funds on executive compensation -- particularly the Board's authorization of 2010 pay increases for Stanley's Chief Executive Officer ("CEO") John F. Lundgren ("Lundgren"), its Chief Financial Officer ("CFO") Donald Allan, Jr. ("Allan"), its Senior Vice President and Group Executive, Construction and DIY Jeffrey D. Ansell ("Ansell"), its Executive Chairman of the Board Nolan D. Archibald ("Archibald"), and its Executive Vice President and Chief Operating Officer ("COO") James M. Loree ("Loree"), despite its stated "pay-for-performance" policy.  A majority of the Company's stockholders agreed; they rejected the Board's business judgment by voting ***against*** the Board's recommended approval of the excessive 2010 executive compensation awards.  Nonetheless, the compensation increases were again ratified by the Board after the vote because it took no action to modify or rescind the prior unjust awards, to the detriment of the Company and its stockholders.

3.      According to its public filings, Stanley manufactures tools and engineered security solutions worldwide.  On March 12, 2010, the Company's predecessors, Stanley Works[1] and the Black & Decker Corporation ("Black & Decker"), merged to form the Company (the "Merger").

4.      Historically, Defendants (defined herein) and, in particular, the Board's Compensation and Organization Committee (the "Compensation Committee") have represented publicly that the Board's executive compensation policy is based on, among other things, Stanley's ***performance***.  For instance, in Stanley's Proxy Statement filed with the SEC on Form DEF 14A on March 11, 2011 (the "Proxy") the Board represented that "[t]he Company's executive compensation

---

[1] For times prior to March 12, 2010, Stanley Works will also be referred to as "Stanley" or the "Company."

programs are designed to pay for performance."  Additionally, the Board represented that "[t]he purpose of our executive compensation program is to provide competitive remuneration as executives create shareholder value, with an appropriate balance between measuring profitability and stability, while assuring that executives drive efficiencies by using capital judiciously.  Our compensation programs are designed to promote…and strengthen the alignment between executive pay, performance and strategy."

5.      Thus in theory (and by the Board's own admissions), when Stanley achieves superior performance, executive compensation should increase, and when Stanley fails to meet these criteria, executive compensation should decrease.  Here, however, the Board and the Company's senior officers presided over abysmal net earnings, and yet the Board substantially increased 2010 executive compensation for Lundgren, Allan, Ansell and Loree.

6.      In particular, despite net earnings declining by $29 million from 2009 to 2010, the Board approved 2010 compensation to the tune of *$92 million* for Lundgren, Allan, Ansell, Archibald and Loree, collectively.

7.      At the Company's Annual Meeting of Shareholders on April 19, 2011, an overwhelming majority (61%) of Stanley stockholders *rejected* the Board's 2010 senior officer compensation recommendation.  As Defendants subsequently reported in a Form 8-K filed with the SEC on April 21, 2011, the say on pay vote resulted in 79,898,615 votes against the 2010 executive compensation recommended by the Board, 51,265,057 votes in favor of the Board's recommendation, and 3,907,971 abstentions.  Thus, the Board's business judgment could not carry the day.  Clearly, Stanley's shareholders concluded that the 2010 executive pay increases were not in their best interests and that the Board was not paying for performance.

8.      Unfortunately for Stanley stockholders, however, despite the adverse shareholder vote, the Board did not rescind the excessive 2010 executive compensation, nor has the Board indicated any intention to do so.

9.      The directors on the Board breached their fiduciary duties by materially increasing 2010 executive compensation in the wake of a substantial decrease in net earnings after claiming to adhere to a "pay-for-performance" policy.

10.     For all of these reasons, the Board cannot now hide behind the so-called "business judgment rule," which is a summary judgment stage or trial stage defense, and which is only available to faithful fiduciaries. Based on the particularized facts alleged herein, Plaintiff and the majority of the Company's stockholders have cast doubt on the Board's decision-making, and the accuracy and truthfulness of its public statements. Accordingly, this derivative action on behalf of the Company should proceed.

11.     By this shareholder derivative action, Plaintiff seeks to recover damages and other relief on behalf of Stanley against Defendants for their breaches of fiduciary duties of candor, good faith, and loyalty, and for unjust enrichment. Absent this action, the majority will of the Company's stockholders shall be rendered meaningless, and the Company's rights against its wayward fiduciaries will not be exercised, to the further detriment of the Company.

12.     In light of Defendants' breaches of fiduciary duty described, *supra*, on August 22, 2011, Plaintiff issued a demand (the "Demand") pursuant to C.G.S.A. § 33-722 on the Board to undertake an independent internal investigation into violations of Connecticut law by Defendants, and to commence an action against Defendants for the benefit of the Company. A true and correct copy of the Demand is attached hereto as Exhibit "A."

13.     On October 25, 2011, Plaintiff's counsel received a letter (the "Refusal") from William F. Sullivan ("Sullivan") of Paul Hastings LLP ("Paul Hastings"), counsel for the Company's purported "Special Committee" which was charged with investigating the Demand, acknowledging that the Board received the Demand. The Refusal stated that the Special Committee was formed to investigate the issues presented in this Demand and in a similar demand letter received by Defendants.   Sullivan informed Plaintiff's counsel that the Special Committee determined that the relief sought by the Plaintiff would not be in the best interests of the Company, and therefore the Special Committee rejected the Demand. The Refusal further stated the Special Committee found no evidence to support a claim that any of the Board members breached their fiduciary duties. Critically, the Special Committee consisted of *two* individuals: defendants Eileen S. Kraus ("Kraus") and Robert L. Ryan ("Ryan"). A true and correct copy of the Refusal is attached hereto as Exhibit "B."

14.     Defendant Ryan is, and was at the time of the wrongdoing alleged herein, a member of the Company's Corporate Governance Committee (the "Corporate Governance Committee"). As set forth, *infra*, the members of the Corporate Governance Committee were charged with reviewing and making recommendations to the Board with respect to the compensation of directors. Pursuant to the Corporate Governance Committee charter, defendant Ryan is responsible for the excessive compensation awarded to defendant Archibald (the Company's Executive Chairman), including Archibald's incentive compensation. Defendant Ryan was charged with investigating his own actions and conduct in connection with the wrongdoing complained of herein. Defendant Ryan has directly caused or allowed the wrongdoing complained of herein. As such, defendant Ryan is incapable of conducting a reasonable investigation of himself and the other Defendants, and any conclusion reached by defendant Ryan was not and cannot have been reached in good faith.

15.     Defendant Kraus is, and was at the time of the wrongdoing alleged herein, Chair of the Company's Audit Committee (the "Audit Committee").  As set forth, *infra*, members of the Audit Committee were charged with ensuring the adequacy of the Company's internal controls.  As a member of the Audit Committee, defendant Kraus is responsible for causing the Company's deficient internal controls with respect to the issuance of false and misleading statements in the Proxy regarding the Company's executive compensation practices.  Defendant Kraus was charged with investigating her own actions and conduct in connection with the wrongdoing complained of herein.  Defendant Kraus has directly caused or allowed the wrongdoing complained of herein.  As such, defendant Kraus is incapable of conducting a reasonable investigation of herself and the other Defendants, and any conclusion reached by defendant Kraus was not and cannot have been reached in good faith.

16.     Defendants Kraus and Ryan were both specifically named in the Demand as being two of the individuals who caused or allowed Stanley to engage in the illicit activity involving executive compensation.  Thus, the Board appointed two individuals to investigate, who themselves were accused of being part and parcel of the wrongdoing.  As such, any inquiry by the Special Committee (*i.e.* defendants Kraus and Ryan) was not and cannot be considered reasonable, and any conclusion reached by the Special Committee (these two defendants) was not and cannot be considered to have been reached in good faith.

17.     Clearly, the Special Committee appointed by the Board did not and could not have conducted a reasonable inquiry, and the conclusions of the Special Committee were not and could not have been reached in good faith.  Accordingly, this derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District and Stanley maintains its corporate headquarters in this District. Further, Defendants either reside in or maintain executive offices in this District, and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

20.     Plaintiff David Yamrus ("Plaintiff") is a shareholder of Stanley and has been continuously throughout the Relevant Period.

21.     Nominal defendant Stanley is a Connecticut corporation with its executives offices located at 1000 Stanley Drive, New Britain, Connecticut. According to its public filings, Stanley manufactures tools and engineered security solutions worldwide. On March 12, 2010, the Company's predecessors, Stanley Works and Black & Decker, completed the Merger.

22.     Defendant Lundgren has served as the Company's President since March 2010 and CEO since March 2004. In addition, defendant Lundgren has served as a director of the Company since March 2004. Defendant Lundgren previously served as the Company's Chairman from March 2004 through March 2010.

23.     Defendant Allan has served as the Company's Senior Vice President since March 2010 and as its CFO since January 1, 2009. Defendant Allan has also served as the Company's Principal Accounting Officer. Further, defendant Allan served as a Vice President of the Company

beginning in 2002 (and until being named Senior Vice President), and as Corporate Controller from 2000 to January 2009.

24.     Defendant Ansell has served as the Company's Senior Vice President and Group Executive, Construction and DIY since March 2010.

25.     Defendant Loree has served the Company's Executive Vice President and COO since January 2009.  Defendant Loree previously served as the Company's CFO from 1999 to January 2009, and served the Company's Executive Vice President of Finance from September 2002 to January 2009.

26.     Defendant Archibald has served as the Executive Chairman of the Board since March 12, 2010.  Defendant Archibald served as Chairman of the Board of Black & Decker from 1987 through March 12, 2010, and as President and CEO of Black & Decker from 1986 through March 12, 2010.

27.     Defendant John G. Breen ("Breen") has served as a director of the Company since July 2000 and was elected Lead Independent Director of the Board on March 12, 2010.  In addition, defendant Breen served as a member of the Compensation Committee during the Relevant Period.

28.     Defendant George W. Buckley ("Buckley") has served as a director of the Company since March 12, 2010, and was previously a director of Black & Decker from 2006 until the Merger. In addition, defendant Buckley served as a member of the Compensation Committee during the Relevant Period.

29.     Defendant Patrick D. Campbell ("Campbell") has served as a director of the Company since October 2008.

30.     Defendant Carlos M. Cardoso ("Cardoso") has served as a director of the Company since October 2007.  In addition, defendant Cardoso served as a member of the Compensation Committee during the Relevant Period.

31.     Defendant Virgis W. Colbert ("Colbert") has served as a director of the Company since July 2003.  In addition, defendant Colbert served as a member of the Compensation Committee during the Relevant Period.

32.     Defendant Robert B. Coutts ("Coutts") has served as a director of the Company since July 2007.

33.     Defendant Manuel A. Fernandez ("Fernandez") served as a director of the Company from 2010 until 2012.  In addition, defendant Fernandez previously served as a director of Black & Decker from 1999 until the Merger.

34.     Defendant Benjamin H. Griswold, IV ("Griswold") has served as a director of the Company since March 12, 2010.  In addition, defendant Griswold previously served as a director of Black & Decker from 2001 until the Merger.  Further, defendant Griswold served as a member of the Compensation Committee during the Relevant Period.

35.     Defendant Kraus has served as a director of the Company since October 1993.  In addition, defendant Kraus served as Chair of Audit Committee.  Further, defendant Kraus was a member of the Special Committee, and charged with investigating her own conduct in connection with the wrongdoing alleged herein.

36.     Defendant Anthony Luiso ("Luiso") has served as a director of the Company since May 29, 2010.  In addition, defendant Luiso previously served as a director of Black & Decker from 1998 until the Merger.  Further, defendant Luiso served as a member of the Compensation Committee during the Relevant Period.

37.    Defendant Marianne Miller Parrs ("Parrs") has served as a director of the Company since April 2008.

38.    Defendant Ryan has served as a director of the Company since March 12, 2010.  In addition, defendant Ryan previously served as a director of Black & Decker from 2005 until the Merger.  Moreover, during the Relevant Period, defendant Ryan served as a member of the Corporate Governance Committee.  Further, defendant Ryan was a member of the Special Committee, and charged with investigating his own conduct in connection with the wrongdoing alleged herein.

39.    Defendant Lawrence A. Zimmerman ("Zimmerman") served as a director of the Company from 2005 until December 31, 2011.  In addition, defendant Zimmerman served as a member of the Compensation Committee during the Relevant Period.

40.    Defendants Lundgren, Allan, Ansell, Loree, Archibald, Breen, Buckley, Campbell, Cardoso, Colbert, Coutts, Fernandez, Griswold, Kraus, Luiso, Parrs, Ryan and Zimmerman shall be collectively referred to herein as the "Defendants."

41.    Defendants Breen, Buckley, Cardoso, Colbert, Griswold, Luiso and Zimmerman shall be collectively referred to herein as the "Compensation Committee Defendants."

### THE DUTIES OF STANLEY'S DIRECTORS AND OFFICERS

42.    As directors and officers of Stanley, Defendants owed Stanley and its shareholders an unremitting duty of loyalty that requires directors and officers to put the best interests of Stanley's shareholders ahead of their own personal interests and the interests of Stanley's corporate managers. Directors who fail to act in the shareholders' best interests breach their fiduciary duty of loyalty and may be held liable for damages.  A claim for a breach of the duty of loyalty is, as a matter of law, non-exculpable.

43.    Because of their executive and directorial positions with Stanley, Defendants knew or should have known that by increasing 2010 executive compensation while Stanley's net earnings plummeted from $227 million in 2009 to $198 million in 2010,[2] they were breaching their fiduciary duties of candor, good faith, loyalty and reasonableness owed to Stanley, as well as unjustly enriching certain of the Company's senior officers.  Defendants also knew or should have known that by unanimously recommending shareholder approval of the 2010 executive compensation in the Proxy, they were breaching their fiduciary duty of candor and violating the Board's purported "pay-for-performance" executive compensation policy.  There is doubt that those decisions were presumptively protected business judgments, and that the Board acted loyally in making these business judgments.

44.    Because of their executive and directorial positions with Stanley, Defendants also knew or should have known that the Proxy's (and other filings') repeated statements that the Board only pays for performance were false and misleading.  By causing such statements to be made, the Defendants were breaching their fiduciary duties of loyalty, good faith, candor and independence owed to Stanley and its shareholders and these actions do not qualify for protection under the business judgment rule.  The 2010 executive compensation increases were inconsistent with the Board's stated pay-for-performance policy and the repeated statements to the contrary were designed to and did conceal the fact the Board was overpaying the Company's executive officers via compensation plans premised on an illusory "pay-for-performance" policy.

---

[2] According to the Company's Annual Report filed with the SEC on February 18, 2011, Defendants reported "Net earnings attributable to Stanley Black & Decker, Inc." as being the following for the period of 2007-2010:  2007: $321 million; 2008: $219 million; 2009: $227 million; 2010: $198 million.

45.     At times relevant hereto, Defendants were the agents of each of the other Defendants and were at all times acting within the course and scope of such agency.

46.     Pursuant to the Company's Corporate Governance Committee Charter, members of the Corporate Governance Committee (including defendant Ryan) were responsible for annually reviewing and making "recommendations to the Board with respect to the compensation and benefits of directors, including under any incentive compensation plans and equity-based compensation plans."

47.     Pursuant to the Company's Audit Committee Charter, members of the Audit Committee (including defendant Kraus) were required to, among other things:

> Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

48.     Pursuant to the Company's Compensation Committee charter, the Compensation Committee Defendants were specifically obligated, *inter alia*, to:

> (a)     Review and approve corporate goals and objectives relevant to CEO compensation and evaluate the CEO's performance in light of those goals and objectives;

> (b)     Annually review and recommend to the Board for approval regarding the annual compensation and annual incentive opportunities of the Senior Executives and equity-based plans for Senior Executives that are subject to Board approval. In addition, periodically and as and when appropriate, the Compensation Committee was to review and make recommendations to the Board regarding the following as they affect the CEO and the Senior Executives: (i) all other incentive awards and opportunities, including both cash-based and equity-based awards and opportunities; (ii) any employment agreements and severance arrangements; (iii) any change-in-control agreements and change-in-control provisions affecting any elements of compensation and benefits; and (iv) any special or supplemental compensation and benefits for the CEO and the Senior Executives and persons who formerly served as the CEO and/or as Senior Executives, including supplemental retirement benefits and the perquisites provided to them during and after employment; and

(c)     In determining the incentive component of the CEO's compensation, consider, among other things, Stanley's *performance.*

## AIDING AND ABETTING AND CONCERTED ACTION

49.     In committing the wrongful acts particularized herein, Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.  In addition to the wrongful conduct particularized herein as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

50.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein.  In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

51.     According to its public filings, Stanley manufactures tools and engineered security solutions worldwide.  On March 12, 2010, the Company's predecessors, Stanley Works and Black & Decker, completed the Merger.

52.     Only a year after the Merger, on April 19, 2011, a majority of voting Stanley shareholders (approximately 61%) rejected the Board's proposed excessive 2010 executive compensation, which the Board recommended that shareholders vote in favor of in the Company's Proxy.

53.     As detailed herein, in light of, *inter alia*, the Board's repeated "pay-for-performance" statements (including those in the Proxy), and the precipitous drop in the Company's net earnings under the direction of this current management team (led by Lundgren, Allan, Ansell and Loree) and

Executive Chairman Archibald, there is reason to doubt that: (a) the Board complied with its fiduciary duties; and/or (b) the Board's 2010 compensation decisions were protected business judgments. Plaintiff alleges that the Board's 2010 compensation decisions constituted a breach of their fiduciary duties of candor, good faith and loyalty, as well as causing Lundgren, Allan, Ansell, Archibald and Loree to be unjustly enriched.

**The Board's Purported "Pay-For-Performance" Policy**

54.     Historically, the Board has represented to Stanley shareholders that its executive compensation practices are firmly rooted in a pay-for-performance policy. For instance, in the Proxy, the Board represented that "[t]he Company's executive compensation programs are designed to pay for performance." Additionally the Board represented that "[t]he purpose of our executive compensation program is to provide competitive remuneration as executives create shareholder value, with an appropriate balance between measuring profitability and stability, while assuring that executives drives efficiencies by using capital judiciously...Our compensation programs are designed to promote...and strengthen the alignment between executive pay, performance and strategy."

55.     Thus, in theory (and by the Board's own admissions), when Stanley achieves superior performance, executive compensation should increase, and when Stanley fails to meet these criteria, executive compensation should decrease. In practice, however, the Board has increased executive compensation dramatically (as discussed below) even when Stanley's net earnings (and other key financial metrics) decline drastically -- as they did from 2007-2010 -- by over 38%. Thus, the Board clearly breached its fiduciary duties by not adhering to its own pay-for-performance policy. Additionally, the Board breached its fiduciary duties by falsely stating to stockholders that it would abide by its pay-for-performance policy.

**2010 Executive Compensation**

56.    In 2010, Stanley's five highest paid Section 16 executive officers -- Lundgren, Allan, Ansell, Archibald, and Loree -- collectively received over **$92 million** in executive compensation, as detailed below:

| Name | Salary and Bonus ($) | Non-Equity Incentive Plan Compensation ($) | Stock and Option Awards ($) | Total Compensation ($)[3] |
|---|---|---|---|---|
| Lundgren | 1,208,433 | 4,342,800 | 26,603,225 | 32,730,259 |
| Allan | 443,850 | 848,920 | 4,337,149 | 5,755,575 |
| Ansell | 456,250 | 878,560 | 4,337,149 | 6,094,514 |
| Archibald | 1,187,500 | 1,875,000 | 22,990,035 | 28,236,565 |
| Loree | 720,833 | 1,914,960 | 15,782,442 | 19,242,903 |
| **Total** | | | | **$92,059,816** |

57.    Notably, these amounts substantially exceeded certain of these executives' compensation for 2009.  For instance, Lundgren's compensation rose by over **240%**, Allan's compensation rose by over **222%**, Ansell's compensation rose by over **215%**, and Loree's compensation rose by over **300%**.

**A Majority of Stanley's Shareholders Reject the Board's Business Judgment**

58.    In the Proxy, the Board "recommended" to Stanley shareholders that they should approve materially increased 2010 executive compensation, stating:

> RESOLVED, that the Company's shareholders approve, on an advisory basis, the compensation of the Company's named executive officers as disclosed in the Compensation Discussion and Analysis, the Summary Compensation Table and the other executive compensation tables and related narratives and descriptions appearing on pages 13 to 43 of the Company's Proxy Statement for the 2011 Annual

---

[3] Total Compensation includes the following: Salary, Bonus, Stock Awards, Option Awards, Non-Equity Incentive Plan Compensation, Change in Pension Value and Nonqualified Deferred Compensation Earnings, and All Other Compensation (as defined in the Proxy).

Meeting of Shareholders.

***

We believe you should vote "FOR" our named executive officer compensation program, which we have designed to (1) promote our post-Merger vision, (2) strengthen the alignment among executive pay, performance and strategy, and (3) encourage our executives to deliver investment returns in line with our shareholders' expectations.

59.     In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") was enacted to require certain public companies to submit executive compensation plans to a shareholder vote, widely known as a say on pay vote. *See e.g.* 15 U.S.C. Section 78n-1.[4]  Congress intended Dodd-Frank's say on pay vote to function as a referendum on whether the executive compensation awarded was in the best interests of shareholders. *See* S. Rep. No. 111-176, at 133 (2010) ("shareowner votes on pay [were meant to] serve as a direct referendum on the decisions of the compensation committee and [] offer a more targeted way to signal shareowner discontent than withholding votes from committee members."). Indeed, according to a Senate Banking Report, the purpose of the Dodd-Frank Act's say-on-pay vote is to provide an efficient means for shareholders, as the owners of a corporation, to collectively express whether the corporation's executive compensation is in their best interests as shareholders. *See* S. Rep. No. 111-76, at 133.

---

[4]  Title IX of the Dodd-Frank Act, known as the Investor Protection and Securities Reform Act of 2010, contains the "say-on-pay" provisions at Subtitle E (Accountability and Executive Compensation), Section 951, requiring, among other things, that "[n]ot less frequently than once every 3 years, a proxy or consent or authorization for an annual or other meeting of the shareholders for which the proxy solicitation rules of the Commission require compensation disclosure shall include a separate resolution subject to shareholder vote to approve the compensation of executives . . . ."

60.    In their relatively short history, negative "say on pay" votes on executive compensation have been extremely rare. For instance, between March 2010 and March 2011, out of 101 companies with say-on-pay voting, only two companies had negative votes rejecting the proposed pay: Jacobs Engineering Group, Inc. and Beazer Homes USA, Inc. *See* www.pionline.com/article/20110315/DAILYREG/110319948.[5] Accordingly, during the first year of "say on pay" votes under the Dodd-Frank Act, voting shareholders overwhelmingly endorsed companies' pay programs, providing 91.2% support on average. *See* June 28, 2011 article entitled "U.S. Proxy Season Review: 'Say on Pay' Votes" (the "June 28 Risk Metrics Article").

61.    This support exceeded the 89.2% average approval in 2010, when "say on pay" votes were mandated only at U.S. government-supported financial firms. For 2011, as of June 28, 2011, shareholders had rejected compensation proposals in say on pay votes at only 37 companies, or just *1.7%* of the more than 2,200 companies in the Russell 3000 index that reported vote results. The June 28 Risk Metrics Article also stated:

> While the median total compensation for CEOs at S&P 500 firms increased by more than 33 percent last year, those pay increases haven't translated into more shareholder opposition, in part because of greater engagement by issuers. Dozens of companies have released supplemental proxy materials to address investor concerns or made late changes to their pay practices to win shareholder support.
>
> So far this season, S&P 500 companies have averaged 88.6 percent support, which is slightly less than the 91.8 percent approval for issuers in the Russell 3000 index, according to ISS data as of June 14. At the sector level, large-cap industrial companies had the lowest average support of 87.1 percent, while large consumer retail firms received the highest approval at 90.7 percent. Large financial firms, which traditionally have received more scrutiny over pay, had the second-highest approval average of 89.7 percent. Within the Russell 3000 index, the energy sector received the lowest level of average support (88.8 percent), while consumer retail firms again received the highest average approval (92.8 percent).

---

[5] In the 2010 proxy season, over 600 companies held say-on-pay votes, and only three of those companies failed to obtain shareholder approval: KeyCorp, Motorola, Inc., and Occidental Petroleum Corp. *See* http://josephandcohen.com/2010/06/joseph-law-newsbrief-%e2%80%9csay-on-pay%e2%80%9d-lessons-from-keycorp%e2%80%99s-2010-%e2%80%9cno-on-pay%e2%80%9d-vote/.

62.     Thus, shareholders almost uniformly supported companies' pay programs, and they had done so by overwhelming margins.  Indeed, of the 1,873 companies that reported voting results as of May 27, 2011, more than two-thirds of those companies received 90% support or more from their voting shareholders.

63.     Stanley shareholders, however, had notably expressed their disapproval of the Board's compensation decisions.  On April 19, 2011, Stanley's voting shareholders resoundingly *rejected* the Board's business judgment and its 2010 executive compensation decision.

64.     As Defendants subsequently reported in a Form 8-K filed with the SEC on April 21, 2011, the say on pay vote resulted in 79,898,615 votes against the 2010 executive compensation recommended by the Board, 51,265,057 votes in favor of the Board's recommendation, and 3,907,971 abstentions.  Thus, the Board's business judgment could not carry the day.  Notably, the vote was not even close -- the Board's recommendation was rejected by approximately *61%* of Stanley's stockholders.  Upon information and belief, despite this adverse vote, the Board has done nothing to recoup any of the unwarranted compensation.

65.     The directors on the Board breached their fiduciary duties by materially increasing 2010 executive compensation in the wake substantially decreased net earnings, after claiming to adhere to a pay-for-performance policy.  The inference that the Board breached its fiduciary duties is supported by the facts that: (a) a majority of the Company's stockholders voted that 2010 executive compensation was not in their best interests; and (b) the Board did not respond to the majority will of its stockholders.

66.     Thus, there is reason to doubt that the Board's actions and public representations were taken or made loyally, and/or in good faith, and/or are entitled to the presumptive protections of the business judgment rule.

### DAMAGES TO STANLEY

67.     Stanley has been damaged by the Board's awards of unwarranted, outsized executive compensation. In 2010, the Company's net earnings decreased by *$29 million* from the previous year. Further, as compared to 2007, the Company's net earnings decreased by *$123 million*. Yet, incredibly, Lundgren's compensation rose by over *240%*, Allan's compensation rose by over *222%*, Ansell's compensation rose by over *215%*, and Loree's compensation rose by over *300%*.

68.     When for the first time given the opportunity to offer their own independent judgment of the Company's executive compensation, a majority of Stanley's voting shareholders firmly rejected the 2010 executive compensation (and rightfully so). Yet, even in the face of this visceral reaction by Stanley's shareholders, the Board has not altered or amended the 2010 compensation, to the detriment of the Company and its stockholders. The Stanley executives who received excessive 2010 compensation have been unjustly enriched.

69.     By this derivative action, Plaintiff seeks to recover damages and other relief for Stanley against Defendants for their breaches of fiduciary duties of candor, good faith and loyalty, and for unjust enrichment. Absent this action, as the Board has already amply demonstrated, the majority will of the Company's stockholders shall be rendered meaningless and the Company's rights against its wayward fiduciaries will not be exercised to the further detriment of the Company.

### DEFENDANTS CAUSED STANLEY TO ISSUE THE MATERIALLY FALSE AND MISLEADING PROXY

70.     During the Relevant Period, Defendants caused Stanley to disseminate to shareholders the Proxy in connection with the Company's annual shareholder meeting. Defendants drafted, approved, reviewed and/or signed the Proxy before it was filed with the SEC and disseminated to Stanley shareholders. Defendants knew, or were deliberately reckless in not knowing, that the Proxy was materially false and misleading.

71.     In particular, in the Proxy, the Board claimed that its executive compensation practices were "designed to pay for performance." The Proxy contained the Board's representation that "[t]he purpose of our executive compensation program is to provide competitive remuneration as executives create shareholder value, with an appropriate balance between measuring profitability and stability, while assuring that executives drive efficiencies by using capital judiciously. Our compensation programs are designed to promote . . . and strengthen the alignment between executive pay, performance and strategy."

72.     Defendants' statements in the Proxy were false and misleading, because even though the Company's net earnings plummeted in 2010, the Board still approved 2010 compensation to the tune of *$92 million* for defendants Lundgren, Allan, Ansell, Archibald and Loree, collectively.

## DERIVATIVE AND DEMAND ALLEGATIONS

73.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

74.     Plaintiff brings this action derivatively on behalf of Stanley to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of Defendants' misconduct. Plaintiff is a current holder of Stanley common stock and will adequately represent the interests of the Company in this litigation. Plaintiff has retained counsel experienced in litigating this type of action.

75.     In light of Defendants' breaches of fiduciary duty described, *supra*, on August 22, 2011, Plaintiff issued the Demand pursuant to C.G.S.A. § 33-722 on the Board to undertake an independent internal investigation into violations of Connecticut law by Defendants, and to commence an action against Defendants for the benefit of the Company. *See* Exhibit A.

76.     On October 25, 2011, Plaintiff's counsel received the Refusal from Sullivan of Paul Hastings, counsel for the Company's purported "Special Committee" which was charged with investigating the Demand, acknowledging that the Board received the Demand. The Refusal stated

that the Special Committee was formed to investigate the issues presented in this Demand and in a similar demand letter received by Defendants. Sullivan informed Plaintiff's counsel that the Special Committee determined that the relief sought by the Plaintiff would not be in the best interests of the Company, and therefore the Special Committee rejected the Demand. The Refusal further stated the Special Committee found no evidence to support a claim that any of the Board members breached their fiduciary duties. Critically, the Special Committee consisted of *two* individuals: defendants Kraus and Ryan. *See* Exhibit B.

77. Defendant Ryan is, and was at the time of the wrongdoing alleged herein, a member of the Corporate Governance Committee. As set forth, *supra*, the members of the Corporate Governance Committee were charged with reviewing and making recommendations to the Board with respect to the compensation of directors. Pursuant to the Corporate Governance Committee charter, defendant Ryan is responsible for the excessive compensation awarded to defendant Archibald (the Company's Executive Chairman), including Archibald's incentive compensation. Defendant Ryan was charged with investigating his own actions and conduct in connection with the wrongdoing complained of herein. Defendant Ryan has directly caused or allowed the wrongdoing complained of herein. As such, defendant Ryan is incapable of conducting a reasonable investigation of himself and the other Defendants, and any conclusion reached by defendant Ryan was not and could not have been reached in good faith.

78. Defendant Kraus is, and was at the time of the wrongdoing alleged herein, Chair of the Audit Committee. As set forth, *supra*, members of the Audit Committee were charged with ensuring the adequacy of the Company's internal controls. As a member of the Audit Committee, defendant Kraus is responsible for causing the Company's deficient internal controls with respect to the issuance of false and misleading statements in the Proxy regarding the Company's executive

compensation practices.  Defendant Kraus was charged with investigating her own actions and conduct in connection with the wrongdoing complained of herein.  Defendant Kraus has directly caused or allowed the wrongdoing complained of herein.  As such, defendant Kraus is incapable of conducting a reasonable investigation of herself and the other Defendants, and any conclusion reached by defendant Kraus was not and could not have been reached in good faith.

79.     Defendants Kraus and Ryan were both specifically named in the Demand as being two of the individuals who caused or allowed Stanley to engage in the illicit activity involving executive compensation.  Thus, the Board appointed two individuals to investigate, who themselves were accused of being part and parcel of the wrongdoing.  As such, any inquiry by the Special Committee (i.e. defendants Kraus and Ryan) was not and cannot be considered reasonable, and any conclusion reached by the Special Committee (these two defendants) was not and cannot be considered to have been reached in good faith.

80.     Clearly, the Special Committee appointed by the Board did not and could not have conducted a reasonable inquiry, and the conclusions of the Special Committee were not and could not have been reached in good faith.  Accordingly, this derivative action should be allowed to proceed.

### FIRST CAUSE OF ACTION
**Against Defendants for Breach of Fiduciary Duty in Connection For the Issuance of False and Misleading Statements**

81.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

82.     Each of the Defendants was a director and/or officer of Stanley and as such owed to Stanley the highest duty known to the law.  Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these Defendants owed to Stanley.

22

83.     As demonstrated by the allegations above, the Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to Stanley and its shareholders, and failed to disclose material information and/or made material misrepresentations to shareholders regarding Stanley's 2010 executive compensation scheme.

84.     The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Stanley and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Stanley and its shareholders.  As directors and/or officers of Stanley, the Defendants participated in the wrongful acts alleged herein.  They thereby breached their fiduciary duties to Stanley's shareholders.

85.     As corporate fiduciaries, the Defendants owed Stanley and its shareholders a duty of candor and full and accurate disclosure.  As a result of the conduct complained of, the Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Stanley's shareholders despite their duties to, *inter alia*, disclose the true facts regarding Stanley.  Thus they have violated their duty of candor.

86.     In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

87.     At all relevant times, the Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was overpaying its directors, officers and/or employees via compensation plans premised on an illusory "pay-for-performance" executive compensation scheme; and (ii) maintain their directorial and executive positions at Stanley and the profits, power and prestige which they enjoyed as a result of these positions.

23

88.     In particular, in the Proxy (and other filings), the Board represented that the intent of the Board's compensation policy is "designed to pay for performance." Further, the Board represented that "[t]he purpose of our executive compensation program is to provide competitive remuneration as executives create shareholder value, with an appropriate balance between measuring profitability and stability, while assuring that executives drive efficiencies by using capital judiciously. Our compensation programs are designed to promote...and strengthen the alignment between executive pay, performance and strategy." Despite this (and other) representations, while the Company's earnings decreased, the Board still increased executive compensation. Accordingly, it is clear that the Board's repeated statements that it pays for performance were false and misleading.

89.     The Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

90.     By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Stanley and its public shareholders, harming Stanley.

## SECOND CAUSE OF ACTION
### Against Defendants for Breach of Fiduciary Duty in Connection with the Board's Compensation Practices

91.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

92.     Each of the Defendants was a director and/or officer of Stanley and as such owed to Stanley the highest duty known to the law. Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these defendants owed to Stanley.

93.     As demonstrated by the allegations above, the Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to Stanley and its shareholders by

failing to adhere to the Company's purported pay-for-performance policy. In particular, in the Proxy (and other filings), the Board represented that the intent of the Board's compensation policy is "designed to pay for performance." Further, the Board represented that "[t]he purpose of our executive compensation program is to provide competitive remuneration as executives create shareholder value, with an appropriate balance between measuring profitability and stability, while assuring that executives drive efficiencies by using capital judiciously. Our compensation programs are designed to promote…and strengthen the alignment between executive pay, performance and strategy." Despite this (and other) representations, while the Company's earnings decreased, the Board still increased executive compensation. Accordingly, it is clear that the Board's repeated statements that it pays for performance were false and misleading.

94.     This increase in executive compensation in direct contravention of the Board's stated pay-for-performance policy was a breach of the Board's fiduciary duties.

95.     The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Stanley and its shareholders, have engaged in unlawful self-dealing, and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Stanley and its shareholders. As directors and/or officers of Stanley, the Defendants participated in the wrongful acts alleged herein. They thereby breached their fiduciary duties to Stanley's shareholders.

96.     In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

97.     The Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

98.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Stanley and its public shareholders, harming Stanley.

## THIRD CAUSE OF ACTION
### Against the Defendants for Breach of Fiduciary Duty in Connection with the Failure to Respond to the Negative Say on Pay Vote

99.    Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

100.    Each of the Defendants was a director and/or officer of Stanley and as such owed to Stanley the highest duty known to the law.  Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these defendants owed to Stanley.

101.    As demonstrated by the allegations above, the Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to Stanley and its shareholders by failing to amend or alter 2010 executive compensation (or even issue a response) in connection with the negative say on pay vote.  In particular, despite having their executive compensation program voted against by 61% of voting shareholders, the Board has done nothing in response, in direct violations of their fiduciary duties.

102.    The Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Stanley and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Stanley and its shareholders.  As directors and/or officers of Stanley, the Defendants participated in the wrongful acts alleged herein.  They thereby breached their fiduciary duties to Stanley's shareholders.

103.    In committing the wrongful acts particularized herein, the Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

104.    The Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

105.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward Stanley and its public shareholders, harming Stanley.

### FOURTH CAUSE OF ACTION
### Against the Defendants for Unjust Enrichment

106.    Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

107.    As a result of the conduct described above, the Defendants will be and have been unjustly enriched at the expense of Stanley, in the form of unjustified salaries, benefits, stock option grants and other emoluments of office.

108.    All the payments and benefits provided to the Defendants based upon or related to Defendants' executive compensation scheme were unjustly awarded and at the expense of Stanley, resulting in substantially unearned benefits.

109.    The Defendants should be ordered to disgorge the gains which they have and/or will unjustly obtain and/or a constructive trust should be imposed for the benefit of the Company.

### FIFTH CAUSE OF ACTION
### Against The Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934

110.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not

false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Proxy violated §14(a) and Rule 14a-9 because it omitted material facts regarding the Company's compensation practices.

112.    The Proxy was false and misleading when issued because it falsely stated that the Board's executive compensation practices were "designed to pay for performance." Additionally, the Proxy contained the Board's representation that "[t]he purpose of our executive compensation program is to provide competitive remuneration as executives create shareholder value, with an appropriate balance between measuring profitability and stability, while assuring that executives drive efficiencies by using capital judiciously. Our compensation programs are designed to promote. . . and strengthen the alignment between executive pay, performance and strategy."

113.    These statements were false and misleading because, as described, *supra*, even though the Company's net earnings plummeted in 2010, the Board still approved 2010 compensation to the tune of *$92 million* for defendants Lundgren, Allan, Ansell, Archibald and Loree, collectively.

114.    In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxy were materially false and misleading.

115.    The misrepresentations and omissions in the Proxy were material to plaintiffs in voting on the Proxy. The Proxy was an essential link in the accomplishment of the continuation of Defendants' violation of the Company's compensation policies, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

116.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.       Against Defendants and in favor of Stanley for the amount of damages sustained by the Company as a result of Defendants' violation of federal and/or state law;

B.       Extraordinary equitable and/or injunctive relief as necessary or permitted by law, equity and the statutory provisions sued hereunder, including disgorgement, attachment, impoundment, imposition of a constructive trust on or otherwise restricting the disposition/exercise of improvidently awarded executive compensation based upon false public and/or SEC filings and/or the proceeds of Defendants' trading activities or their other assets so as to ensure that Plaintiff on behalf of Stanley has an effective remedy;

C.       Ordering the implementation and administration of internal controls and systems at Stanley designed to prohibit and prevent excessive and/or unwarranted executive compensation payments to Stanley's CEO, CFO, COO, and other senior executives and directors;

D.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

E.       Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

PLAINTIFFS

/s/ Nancy A. Kulesa
JEFFREY S. NOBEL (CT 04855)
MARK P. KINDALL (CT 409470)
NANCY A. KULESA (CT 25384)
Izard Nobel LLP
29 South Main Street, Suite 215
West Hartford, CT  06107
Telephone:  (860) 493-6292
Facsimile:  (860) 493-6290
E-mail:  jnobel@izardnobel.com
E-mail:  nkulesa@izardnobel.com

**THE WEISER LAW FIRM,
P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
JOSEPH M. PROFY
DAVID M. PROMISLOFF
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

**RYAN & MANISKAS, LLP**
KATHARINE M. RYAN
995 Old Eagle School Rd., Ste. 311
Wayne, PA 19087
Telephone: 484-588-5516
Facsimile: 484-450-2582

Counsel for Plaintiff

## VERIFICATION

I, David Yamrus, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.


DATED: _5/9/12_                                   _____
                                                                David Yamrus

# Exhibit A



## THE WEISER LAW FIRM, P.C.

WWW.WEISERLAWFIRM.COM

PENNSYLVANIA
121 N. WAYNE AVENUE, SUITE 100
WAYNE, PA 19087
TELEPHONE: (610) 225-2677
FACSIMILE:  (610) 225-2678

CALIFORNIA
12707 HIGH BLUFF DRIVE, SUITE 200
SAN DIEGO, CA 92130
TELEPHONE: (858) 794-1441
FACSIMILE:  (858) 794-1450

August 22, 2011

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Nolan D. Archibald
Executive Chairman of the Board of Directors
Stanley Black & Decker, Inc.
1000 Stanley Drive
New Britain, CT 06053

**Re:** **Shareholder Demand Pursuant to C.G.S.A. § 33-722**

Dear Mr. Archibald:

This firm along with Ryan and Maniskas, LLP represents David Yamrus (the "Stockholder"), a current holder of common stock of Stanley Black & Decker, Inc. ("Stanley" or the "Company"). Pursuant to C.G.S.A. § 33-722, I write on behalf of the Stockholder to demand that Stanley's Board of Directors (the "Board") take action to remedy breaches of fiduciary duties and/or violations of law in connection with the excessive compensation awarded by the Board to the Company's senior executives during 2010, which was later directly rebuked by Stanley stockholders. These executives include yourself ("Archibald"), John F. Lundgren ("Lundgren"), Donald Allan, Jr. ("Allan"), Jeffery D. Ansell ("Ansell"), and James M. Loree ("Loree"). Additionally the Board is comprised of the following directors: Archibald, John G. Breen ("Breen"), George W. Buckley ("Buckley"), Patrick D. Campbell ("Campbell"), Carlos M. Cardoso ("Cardoso"), Virgis W. Colbert ("Colbert"), Robert B. Coutts ("Coutts"), Manuel A. Fernandez ("Fernandez"), Benjamin H. Griswold, IV ("Griswold"), Eileen S. Kraus ("Kraus"), Lundgren, Anthony Luiso ("Luiso"), Marianne Miller Parrs ("Parrs"), Robert L. Ryan ("Ryan"), and Lawrence A. Zimmerman ("Zimmerman"). Collectively, the foregoing executive officers and directors of the Company will be referred to herein as "Management."

As you are aware, by reason of their positions as officers and directors of Stanley and because of their ability to control the business and corporate affairs of Stanley, Management owed and owes Stanley and its shareholders the fiduciary obligations of good faith, loyalty, and due care, and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Stockholder understands that Management has violated these core fiduciary duty principles, causing Stanley to suffer damages.

1

# I.   FACTUAL BACKGROUND

## A.   Overview of the Company and its Problems

According to its public filings, Stanley manufactures tools and engineered security solutions worldwide.  On March 12, 2010, the Company's predecessors, Stanley Works and the Black & Decker Corporation, merged to form the Company (the "Merger").  Only a year after the Merger, on April 19, 2011, a majority of voting Stanley shareholders (approximately 61%) rejected the Board's proposed excessive 2010 executive compensation, which the Board recommended that shareholders vote in favor of in the Company's Proxy Statement filed with the SEC and disseminated to shareholders on March 11, 2011 (the "Proxy").

In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") was enacted to require certain public companies to submit executive compensation plans to a shareholder vote, widely known as a "say on pay" vote. *See e.g.* 15 U.S.C. Section 78n-1.[1]  Congress intended Dodd-Frank's say-on-pay vote to function as a referendum on whether the executive compensation awarded was in the best interests of shareholders. *See* S. Rep. No. 111-176, at 133 (2010) ("shareowner votes on pay [were meant to] serve as a direct referendum on the decisions of the compensation committee and [] offer a more targeted way to signal shareowner discontent than withholding votes from committee members.").  Indeed, according to a Senate Banking Report, the purpose of the Dodd-Frank Act's say-on-pay vote is to provide an efficient means for shareholders, as the owners of a corporation, to collectively express whether the corporation's executive compensation is in their best interests as shareholders. *See* S. Rep. No. 111-76, at 133.

In their relatively short history, negative "say on pay" votes on executive compensation have been extremely rare.  For instance, between March 2010 and March 2011, out of 101 companies with say-on-pay voting, only two companies had negative votes rejecting the proposed pay: Jacobs Engineering Group, Inc. and Beazer Homes USA, Inc.  *See* www.pionline.com/article/20110315/DAILYREG/110319948.[2]  Accordingly, during the first year of "say on pay" votes under the Dodd-Frank Act, voting shareholders overwhelmingly endorsed companies' pay programs, providing 91.2% support on average. *See* June 28, 2011 article entitled "U.S. Proxy Season Review: 'Say on Pay' Votes" available at

---

[1] Title IX of the Dodd-Frank Act, known as the Investor Protection and Securities Reform Act of 2010, contains the "say-on-pay" provisions at Subtitle E (Accountability and Executive Compensation), Section 951, requiring, among other things, that "[n]ot less frequently than once every 3 years, a proxy or consent or authorization for an annual or other meeting of the shareholders for which the proxy solicitation rules of the Commission require compensation disclosure shall include a separate resolution subject to shareholder vote to approve the compensation of executives . . ."

[2] In the prior year's proxy season (the 2010 proxy season), over 600 companies held say-on-pay votes, and only three of those companies failed to obtain shareholder approval:  KeyCorp, Motorola, Inc., and Occidental Petroleum Corp. *See* http://josephandcohen.com/2010/06/joseph-law-newsbrief-%e2%80%9csay-on-pay%e2%80%9d-lessons-from-keycorp%e2%80%99s-2010-%e2%80%9cno-on-pay%e2%80%9d-vote/.

http://blog.riskmetrics.com (the "June 28 Risk Metrics Article").

This support exceeded the 89.2% average shareholder approval in 2010, when "say on pay" votes were mandated only at U.S. government-supported financial firms. For 2011, as of June 28, 2011, shareholders had rejected compensation proposals in say on pay votes at only 37 companies, or just *1.7%* of the more than 2,200 companies in the Russell 3000 index that have reported vote results. The June 28 Risk Metrics Article also stated:

> So far this season, S&P 500 companies have averaged 88.6 percent support, which is slightly less than the 91.8 percent approval for issuers in the Russell 3000 index, according to ISS data as of June 14. At the sector level, large-cap industrial companies had the lowest average support of 87.1 percent, while large consumer retail firms received the highest approval at 90.7 percent. Large financial firms, which traditionally have received more scrutiny over pay, had the second-highest approval average of 89.7 percent. Within the Russell 3000 index, the energy sector received the lowest level of average support (88.8 percent), while consumer retail firms again received the highest average approval (92.8 percent).

Thus, shareholders have almost uniformly supported companies' pay programs, and they have done so by overwhelming margins. Indeed, of the 1,873 companies that had reported voting results as of May 27, 2011, more than two-thirds of those companies received 90% support or more from their voting shareholders.

## B.    The Board's Purported "Pay-For-Performance" Policy

Historically, the Board has represented to Stanley shareholders that its executive compensation practices are firmly rooted in a pay-for-performance policy. For instance, in the Proxy, the Board represented that "[t]he Company's executive compensation programs are designed to pay for performance." Additionally the Board represented that "[t]he purpose of our executive compensation program is to provide competitive renumeration as executives create shareholder value, with an appropriate balance between measuring profitability and stability, while assuring that executives drives efficiencies by using capital judiciously...Our compensation programs are designed to promote...and strengthen the alignment between executive pay, performance and strategy."

Thus, in theory (and by the Board's own admissions), when Stanley achieves superior performance, executive compensation should increase, and when Stanley fails to meet these criteria, executive compensation should decrease. In practice, however, the Board has increased executive compensation dramatically (as discussed below) even when Stanley's net earnings (and other key financial metrics) decline drastically -- as they did from 2007-2010 -- by over 38%.[3] Thus, the Board clearly breached its fiduciary duties by not adhering to its own pay-for-

---

[3] According to the Company's Annual Report filed with the SEC on February 18, 2011, Management reported "Net earnings attributable to Stanley Black & Decker, Inc." as being the following for the period of 2007-2010:  2007: $321 million; 2008: $219 million; 2009: $227 million; 2010: $198 million.

performance policy. Additionally, the Board breached its fiduciary duties by falsely stating to stockholders that it would abide by its pay-for-performance policy.

### C.   Stanley's 2010 Executive Compensation

In 2010, Stanley's five highest paid Section 16 executive officers -- Lundgren, Allan, Ansell, Archibald, and Loree -- collectively received over *$92 million* in executive compensation, as detailed below:

| Name | Salary and Bonus ($) | Non-Equity Incentive Plan Compensation ($) | Stock and Option Awards ($) | Total Compensation ($)[4] |
|---|---|---|---|---|
| Lundgren | 1,208,433 | 4,342,800 | 26,603,225 | 32,730,259 |
| Allan | 443,850 | 848,920 | 4,337,149 | 5,755,575 |
| Ansell | 456,250 | 878,560 | 4,337,149 | 6,094,514 |
| Archibald | 1,187,500 | 1,875,000 | 22,990,035 | 28,236,565 |
| Loree | 720,833 | 1,914,960 | 15,782,442 | 19,242,903 |
| **Total** | | | | **$92,059,816** |

Notably, these amounts substantially exceeded certain of these executives' compensation for 2009. For instance, Lundgren's compensation rose by over *240%*, Allan's compensation rose by over *222%*, Ansell's compensation rose by over *215%*, and Loree's compensation rose by over *300%*.

### D.   Stanley's Shareholders Soundly Reject the Board's Recommended 2010 Executive Compensation

In the Proxy, the Board "recommended" to Stanley shareholders that they should approve materially increased 2010 executive compensation, stating:

> RESOLVED, that the Company's shareholders approve, on an advisory basis, the compensation of the Company's named executive officers as disclosed in the Compensation Discussion and Analysis, the Summary Compensation Table and the other executive compensation tables and related narratives and descriptions appearing on pages 13 to 43 of the Company's Proxy Statement for the 2011 Annual Meeting of Shareholders.

***

---

[4] Total Compensation includes the following: Salary, Bonus, Stock Awards, Option Awards, Non-Equity Incentive Plan Compensation, Change in Pension Value and Nonqualified Deferred Compensation Earnings, and All Other Compensation (as defined in the Proxy).

We believe you should vote "FOR" our named executive officer compensation program, which we have designed to (1) promote our post-Merger vision, (2) strengthen the alignment among executive pay, performance and strategy, and (3) encourage our executives to deliver investment returns in line with our shareholders' expectations.

As Management subsequently reported in a Form 8-K filed with the SEC on April 21, 2011, the say-on-pay vote resulted in 79,898,615 votes against the 2010 executive compensation recommended by the Board, 51,265,057 votes in favor of the Board's recommendation, and 3,907,971 abstentions.  Thus, the Board's business judgment could not carry the day.  Notably, the vote was not even close -- the Board's recommendation was rejected by approximately *61%* of Stanley's stockholders.  Upon information and belief, despite this adverse vote, the Board has done nothing to recoup any of the ill-gotten compensation.

## II.      DEMAND PURSUANT TO C.G.S.A. § 33-722

Based on these events, Management: (i) breached their fiduciary duties of loyalty and good faith in connection with their management, operation and oversight of Stanley's business; (ii) breached their fiduciary duty of good faith to establish and maintain adequate internal controls; and (iii) breached their fiduciary duties by disseminating misleading information. Accordingly, pursuant to C.G.S.A. § 33-722, the Stockholder demands that the Board:

(i)      undertake (or cause to be undertaken) an independent internal investigation into the violations of Connecticut and/or federal law by each member of Management; and

(ii)     commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties and violations of Connecticut and/or federal law alleged herein.

Pursuant to C.G.S.A. § 33-722, if within ninety (90) days after receipt of this letter the Board has not commenced an action and taken the other measures as demanded herein, the Stockholder will commence a shareholder's derivative action on behalf of the Company seeking appropriate relief.  In the meantime, the Stockholder demands that the Board confirm in writing within ten (10) days that no additional excessive compensation will be paid to Management for the duration of the time necessary for the Company to comply with this demand.

Very truly yours,

THE WEISER LAW FIRM, P.C.

Robert B. Weiser

5

RYAN AND MANISKAS, LLP

Katharine M. Ryan

cc:    David Yamrus

# Exhibit B

11-42

# PAUL
# HASTINGS

(213) 683-6252
williamsullivan@paulhastings.com

October 25, 2011

**VIA UPS**

Travis E. Downs III                          Robert B. Weiser
Benny C. Goodman III                     The Weiser Law Firm, P.C.
Robbins Geller Rudman & Dowd LLP    121 N. Wayne Avenue, Suite 100
655 West Broadway, Suite 1900         Wayne, PA 19087
San Diego, CA 92101

Katharine M. Ryan                           Eduard Korsinsky
Ryan and Maniskas, LLP                   Douglas E. Julie
995 Old Eagle School Rd., Suite 311   Levi & Korsinsky LLP
Wayne, PA 19087                           30 Broad Street, 15th Floor
                                                    New York, NY 10004

Re:    Stanley Black & Decker, Inc. Special Committee's Inquiry into Shareholder Litigation Demand

Dear All:

On June 30, 2011, Stanley Black & Decker, Inc. ("SBD" or the "Company") received a shareholder litigation demand letter from the City of Roseville Employees' Retirement System (the "City of Roseville") related to the Company's 2010 executive compensation. Upon review, pursuant to Conn. Gen. Stat. § 33-724(a), the SBD board of directors (the "Board") appointed Eileen S. Kraus and Robert L. Ryan, as qualified directors under Connecticut law, to serve on a special committee (the "Special Committee") tasked with conducting a reasonable and good faith inquiry into the litigation demand.[1]

The Special Committee invited each shareholder to provide the Special Committee with any additional information it may have pertaining to the Shareholder Litigation Demand and also requested that each shareholder provide confirmatory information regarding its status as a SBD shareholder. To date, the Special Committee has not received any additional information from any shareholder or any confirmatory information regarding their shareholder status. *See Richelson v. Yost,* 738 F. Supp. 2d 589, 600 (E.D. Pa. 2010) (dismissing derivative action brought by plaintiffs who failed to properly provide confirmatory information regarding their status as shareholders).

---

[1] The Board received a second shareholder litigation demand letter from David Yamrus on August 24, 2011, requesting that SBD take action against the Board and its executive officers for substantially similar reasons as those proffered in the first shareholder litigation demand letter. On September 12, 2011, Andrew Mangiafico filed a Verified Shareholder Derivative Complaint in Connecticut Superior Court, alleging claims in connection with SBD's executive compensation for 2010. Two days later, on September 14, 2011, John W. Lebett sent the Board a third shareholder litigation demand letter. The three shareholder litigation demand letters and the complaint filed by Mr. Mangiafico (collectively, the "Shareholder Litigation Demand") were referred to the Special Committee.

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000 †  www.paulhastings.com

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 2

## I.    EXECUTIVE SUMMARY

The Special Committee conducted an inquiry into challenges to SBD's executive compensation for 2010 in light of the Company's stated pay-for-performance policy.  The Special Committee has endeavored to complete a comprehensive inquiry into the allegations, which has entailed evaluating (1) the Company's historical financial performance, (2) the compensation packages of certain Company executives, and (3) the various legal issues raised by the Shareholder Litigation Demand.

The Special Committee recognizes that SBD seeks to increase shareholder value over the long-term. The Special Committee concludes that SBD's 2010 financial performance provided increased shareholder value after the merger (the "Merger") between The Stanley Works ("Stanley") and The Black & Decker Corporation ("Black & Decker").  The Special Committee finds that the Shareholder Litigation Demand improperly assesses SBD's 2010 financial performance metrics by including one-time Merger-related charges to net earnings from continuing operations, earnings per share, and return on average equity.  Properly excluding one-time Merger-related charges to show year-over-year performance, SBD outpaced Stanley's performance metrics from 2007 through 2009. Notably, in difficult economic conditions, Stanley outperformed its peer group from 2007 through 2009.  In 2010, SBD continued to outperform its peer group and the market as reflected by the Company's stock price performance, market capitalization growth, and significant increase in its quarterly dividend.

The Special Committee concludes that the challenged executive compensation packages are consistent with the Company's pay-for-performance policy.  SBD's 2010 executive compensation reflects the increased complexity and responsibilities associated with a company of SBD's size after the Merger.  The Company has positioned its executive compensation packages close to the median compensation for executives at a peer group of similarly-sized companies.  Additionally, the Special Committee finds that the 2010 compensation executive compensation approved in connection with the Merger reflected a valid and reasonable exercise of business judgment to retain key SBD executives and, in the case of Executive Chairman Nolan Archibald, tied projected cost synergies from the Merger with his long-term compensation.

The Special Committee concludes that bringing legal action contemplated by the Shareholder Litigation Demand would not be in the best interests of SBD or its shareholders.  The Special Committee finds that legal action is unlikely to result in any monetary recovery to SBD and that such action is not supported by a "cost/benefit" analysis.  The Special Committee also concludes that, apart from the merits of any legal claims, several litigation risks weigh heavily against pursuing any legal action, including SBD's obligation to indemnify SBD directors (subject to a right of recoupment), the impact of a settlement release covering former Black & Decker shareholders, and the potential triggering of termination clauses in the employment agreements of certain SBD executives.  The Special Committee has determined not to bring the legal action contemplated by the Shareholder Litigation Demand.

## II.    SUMMARY OF FINDINGS

Upon conducting its reasonable and good faith inquiry, the Special Committee determined that, based on its business judgment, pursuing the relief sought in the Shareholder Litigation Demand would not be in the best interest of SBD and its shareholders, and therefore has decided to reject the Shareholder

# PAUL
# HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 3

Litigation Demand.  In reaching its conclusion, the Special Committee considered several key factors including:

- the Company's performance has led to a substantial increase in shareholder value when properly accounting for the one-time Merger-related charges;[2]

- the Company's 2010 stock performance, a key indicator of shareholder value, outpaced its peer group 3 to 2 and outperformed the S&P 500 nearly 3 to 1;

- the Company substantially increased its annual dividend to shareholders in February 2011, reflecting strong post-Merger performance;

- the performance metrics offered in the Shareholder Litigation Demand fail to accurately reflect SBD's 2010 financial performance because the offered metrics include one-time Merger-related charges;

- the performance metrics offered in the Shareholder Litigation Demand fail to accurately reflect SBD's executives' contributions to SBD's shareholder value;

- a substantial portion of the executive compensation for 2010 that is challenged in the Shareholder Litigation Demand was approved in connection with the Merger;[3]

- the Company's 2010 executive compensation challenged in the Shareholder Litigation Demand reflects a valid and reasonable exercise of the Board's business judgment to retain key SBD executives after the Merger of Stanley and Black & Decker;

- the compensation packages for Messrs. Archibald and Lundgren were set at the time of the Merger and neither received any additional merit-based adjustment for 2010;

- the employment agreements with Messrs. Archibald, Lundgren and Loree were the subject of Merger-related litigation, which was subsequently settled, and includes a release of all claims by Black & Decker shareholders arising out of the Merger;

---

[2] In its 2010 Annual Report, filed February 18, 2011, the Company disclosed that Merger-related charges totaled $538 million including:  (1) $195 million in cost of sales related to inventory step-up amortization; (2) $82 million in selling, general and administrative for certain executive compensation costs and integration-related consulting fees; (3) $37 million in other transaction costs; and (4) $224 million in restructuring and asset impairment charges primarily for severance payments and facility closures.

[3] The February 2, 2010 Stanley and Black & Decker Joint Merger Proxy Statement ("Joint Proxy Statement") disclosed to both Stanley and Black & Decker's shareholders that employment agreements entered into with Mr. Archibald, John F. Lundgren, and James M. Loree were contingent on completion of the Merger.  Over 79% of all outstanding Black & Decker shares voted to approve the Merger.  Similarly, over 97% of Stanley's shares voted to approve measures necessary for completion of the Merger, including the issuance of additional Stanley common stock and amendments to Stanley's certificate of incorporation.

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 4

- the non-Merger-related 2010 executive compensation challenged in the Shareholder Litigation Demand is tied to SBD's pay-for-performance policy because 70 to 85% of SBD's executive pay is contingent upon achieving significant financial gains and increasing shareholder value;

- SBD's performance from the date of the Merger announcement through the date of the City of Roseville's demand letter has been particularly strong relative to its peer group;

- in approving the Merger-related compensation, the Stanley board of directors reasonably relied on the advice and recommendations of its independent compensation consultant, Towers Perrin;

- in approving executive compensation for 2010, the Board reasonably relied on the advice and recommendations of the Company's independent compensation consultants, Towers Watson;

- the pursuit of legal action contemplated by the Shareholder Litigation Demand raises the substantial risk to SBD of triggering termination clauses in Messrs. Archibald, Lundgren, and Loree's employment agreements, which would then accelerate SBD's obligations to pay Messrs. Archibald, Lundgren, and Loree under the employment agreements;

- the pursuit of legal action contemplated by the Shareholder Litigation Demand raises the substantial risk to SBD of losing top SBD executives who are deemed critical to the successful integration of the combined Company; and

- the pursuit of legal action contemplated by the Shareholder Litigation Demand raises the substantial risk that any possible benefits derived by SBD from pursuing legal action against the named executives, directors, and/or Towers Watson/Towers Perrin would be substantially outweighed by the expense of maintaining the litigation, including considerations involving indemnification.

Based on these factors and the totality of information learned and considered during its inquiry, the Special Committee concludes that SBD should not bring any legal actions in connection with the allegations made in the Shareholder Litigation Demand.

III.    **THE SHAREHOLDER LITIGATION DEMAND**

The Shareholder Litigation Demand requests that the Board seek relief against certain named SBD directors, certain named SBD executives, and the Company's outside executive consultant, Towers Watson,[4] in connection with the SBD's executive compensation for 2010. Specifically, the Shareholder Litigation Demand asserts that SBD's executives, Mr. Lundgren (President and Chief Executive Officer ("CEO")), Mr. Archibald (Executive Chairman), Donald Allan, Jr. (Senior Vice President and Chief

---

[4] The City of Roseville identifies Watson Wyatt Worldwide, Inc. ("Watson Wyatt") as SBD's executive compensation consultant during the relevant period. Watson Wyatt Worldwide and Towers Perrin merged to create Towers Watson in January of 2010. Towers Watson consulted with SBD regarding its 2010 executive compensation. Further, the Special Committee notes that the City of Roseville is the only shareholder that identifies the Company's executive compensation consultant as having any potential liability.

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 5

Financial Officer ("CFO"), Jeffery D. Ansell (Senior Vice President and Group Executive, CDIY), and Mr. Loree (Executive Vice President ("EVP") and Chief Operating Officer ("COO")) (collectively the "SBD Executives"), received compensation in 2010 that did not comport with SBD's pay-for-performance policies and was designed to enrich the SBD Executives at the expense of the Company. The Shareholder Litigation Demand asserts: (1) that the SBD directors breached their duty of loyalty by approving the Company's 2010 executive compensation and failing to provide material facts regarding the Company's 2010 executive compensation; (2) that the SBD Executives were unjustly enriched by receiving compensation in 2010, which was purportedly not based on SBD's pay-for-performance policy; and (3) that Towers Watson/Towers Perrin breached its contract with SBD by failing to render SBD competent and sound advice and services in connection with SBD's 2010 executive compensation.

To support the claims, the Shareholder Litigation Demand compares certain performance data for Stanley from 2007, 2008, and 2009 to performance metrics for SBD in 2010. The Shareholder Litigation Demand asserts that the Company's 2010 performance greatly declined, as defined by (1) net earnings from continuing operations; (2) basic earnings per share ("EPS"); (3) total diluted EPS; (4) return on average equity from continuing operations; and (5) gross profits from continuing operations as a percentage of net sales.

Additionally, the Shareholder Litigation Demand references the April 19, 2011 non-binding "Say on Pay" vote by SBD's shareholders on executive compensation. The Shareholder Litigation Demand states that the shareholder's negative majority vote, although non-binding, creates a rebuttable presumption that the 2010 executive compensation was not in the best interests of SBD. Further, the Shareholder Litigation Demand contends that the presumption cannot be rebutted in light of SBD's 2010 performance.

IV.     THE SPECIAL COMMITTEE'S REASONABLE INQUIRY

On July 26, 2011, the Special Committee engaged Paul Hastings LLP ("Paul Hastings"), as independent outside counsel, to assist the Special Committee conduct its inquiry. Upon its initial meeting, the Special Committee reviewed and analyzed the allegations made in the Shareholder Litigation Demand. In response to those allegations, the Special Committee formulated an inquiry plan to determine whether SBD should pursue legal action. The Special Committee reviewed and considered the approval process for the 2010 compensation packages of Messrs. Lundgren, Archibald, Allan, Ansell, and Loree, including the roles of Watson Wyatt, Towers Perrin, and Towers Watson. Additionally, the Special Committee also considered whether the 2010 executive compensation comported with SBD's stated pay-for-performance policy.

The Special Committee, through counsel, reviewed over 2,500 pages of documents including, but not limited to: (1) SBD's Board meeting minutes and Board materials from July 31, 2009 through April 19, 2011, as well as relevant compensation materials attached to the Board meeting minutes; (2) SBD's Compensation and Organization ("C&O") Committee meeting minutes and attached materials from October 24, 2009 through May 6, 2011; (3) SBD's organizational and compliance materials; (4) SBD's publicly filed documents including: the Joint Proxy Statement, Stanley's March 12, 2010 Form 8-K, Black & Decker's March 12, 2010 Form 8-K, SBD's 2010 Form 10-K and Annual Report, Stanley's 2009 Form 10-K and Annual Report, SBD's 2011 Annual Shareholder Meeting Proxy Statement, dated March 11, 2011 (the "Say on Pay Proxy"), SBD's Form 10-Qs for 2010 and for 2011, and the April 21, 2011 Form 8-K; (5) SBD's Independent Executive Compensation Consultant Materials; (5) SBD analyst

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 6

reports; (6) SBD stock price comparison charts; (7) Black & Decker's Merger-related shareholder litigation and settlement documents; and (8) press releases and related announcements from November 2, 2009 through July 2011.

Further, the Special Committee conducted 10 formal interviews with individuals who participated in the Company's 2010 executive compensation decision-making process including: (1) Steven Brodrick, Director of Financial Planning and Analysis; (2) John G. Breen, Lead Independent Director; (3) David Glinka and Steve Borsy, Partners at Ernst & Young LLP; (4) Lawrence A. Zimmerman, Director and Chairman of the C&O Committee; (5) John England, Former Compensation Consultant for Towers Perrin; (6) Mark J. Mathieu, Senior Vice President of Human Resources; (7) Kate W. Vanek, Vice President of Investor Relations; (8) Paul Platten, Global Head of Rewards, Talent and Communication at Towers Watson; (9) Virgis W. Colbert, Director and Former Chairman of the C&O Committee; and (10) Ira Kay, Former Compensation Consultant for Watson Wyatt.

The Special Committee also met seven times from July 26, 2011 through October 18, 2011. The Special Committee discussed the inquiry process and analyzed the documents reviewed and the interviews conducted in light of the allegations in the Shareholder Litigation Demand. The Special Committee also held detailed and full discussions of the merits of their inquiry. With the assistance of counsel, the Special Committee prepared an 87-page report (the "Inquiry Report"), with 62 accompanying exhibits, detailing its findings and conclusions.

V.      THE DODD-FRANK ACT AND THE "SAY ON PAY" ADVISORY SHAREHOLDER VOTE

Section 951 of the Dodd-Frank Act ("Dodd-Frank") added a new Section 14A to the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78n-1. Section 14A requires companies to include non-binding "Say on Pay" proposals in their proxy statements at least once every three years. The statute clearly states that such votes are non-binding and do not create any additional fiduciary duties for directors or alter their existing fiduciary duties:

> The shareholder vote . . . *may not be construed* – (1) as overruling a decision by such issuer or board of directors; (2) to create or imply any change to the fiduciary duties of such issuer or board of directors; [or] (3) to create or imply any additional fiduciary duties for such issuer or board of directors[.]"

15 U.S.C. § 78n-1(c) (emphasis added). Based on the language in Dodd-Frank, the Special Committee finds no support for the proposition that an adverse shareholder vote on executive compensation creates or rebuts any presumption with respect to a director's business judgment.

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 7

## VI.    THE SPECIAL COMMITTEE'S FACTUAL FINDINGS AND CONCLUSIONS

### A.    SBD's 2010 Financial Performance was Particularly Strong

As a U.S. public company, SBD disclosed its financial performance in its quarterly and annual reports filed with the Securities and Exchange Commission.  Contrary to the assertions made in the Shareholder Litigation Demand, the Special Committee found that the Company's 2010 financial performance was strong and trending upward.

The Special Committee finds that the performance data comparisons made in the Shareholder Litigation Demand presents an inaccurate and incomplete performance data set.  Specifically, the Shareholder Litigation Demand fails to account for one-time Merger-related charges totaling $538 million.  In the Say on Pay Proxy, SBD indicates it relied on financial metrics that exclude the one-time Merger-related charges to evaluate the Company's year-over-year performance.[5]  Excluding the one-time Merger-related charges for a year-over-year performance comparison, SBD's 2010 performance was particularly strong. The impact of the one-time Merger-related charges is reflected in the following table.

| Financial Performance Metrics for SBD (2009-2010) | | | |
| --- | --- | --- | --- |
| | 2009 | 2010 (As Alleged in the Shareholder Demand) | 2010 (Excluding Merger-Related Charges) |
| Net Earnings for Continuing Operations | $227 million | $198.2 million | **$619 million** |
| Basic EPS for Continuing Operations | $2.84 | $1.34 | **$4.20** |
| Total Diluted EPS | $2.79 | $1.32 | **$4.12** |
| Return on Average Equity from Continuing Operations | 12.4% | 4.4% | **14.2%** |
| Gross Profit from Continuing Operations as % of Net Sales | 40% | 35% | **39%** |

---

[5] The Special Committee finds that excluding Merger-related charges presents a true reflection of the Company's year-over-year financial performance as indicated by the Company's strong stock price performance relative to the market and its peer group in difficult economic conditions.

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 8

Moreover, in the Merger announcement, Stanley and Black & Decker projected that the combined Company would generate $350 million of cost synergies over three years. As detailed in the Company's press releases, quarterly reports, and annual reports, the Company now anticipates it will generate $450 million in cost synergies in less than three years.[6]

The Special Committee also finds shareholder value, reflected by the Company's stock price performance, increased substantially in 2010. The Company outperformed the market nearly 3 to 1 in 2010 – S&P 500 increased 13%, whereas SBD's stock price increased 30%.[7] From the date of the Merger announcement (November 2, 2009) through the date the City of Roseville first asserted SBD's financial performance was weak (May 6, 2011), the Company's stock price increased 63%.[8] It is no coincidence therefore, that the Company's performance also outpaced its peer group 3 to 2 in 2010. The Special Committee also notes that the Company's performance was so strong that the Company increased dividends by 21% in February of 2011.

B.    SBD's Executive Compensation Set at the Merger

With the Merger between Stanley and Black & Decker in 2010, the combined Company entered into new or amended employment agreements with Messrs. Archibald, Lundgren, and Loree to reflect the executives' new roles at the combined Company. The agreements reflected the increased complexity and responsibilities the SBD Executives would encounter steering a company of SBD's size, as well as to secure the retention of the Company's top executives. The new employment agreements were extensively detailed in the Joint Merger Proxy Statement, dated February 2, 2010, and only became effective upon completion of the Merger.

1.    Mr. Archibald's Merger-Related Compensation

In connection with the Merger, on November 2, 2009, Stanley's board of directors approved Mr. Archibald's Executive Chairman Agreement with the combined Company for a three-year period. Formerly, Mr. Archibald served as President and CEO of Black & Decker from 1986 through March 12, 2010. As a long-standing successful CEO, Mr. Archibald had accumulated a significant amount of contractually obligated compensation. To assess Mr. Archibald's compensation and to assist the Stanley C&O Committee formulate an Executive Chairman Agreement that comported with Stanley compensation policies, paid for performance, and fairly compensated Mr. Archibald for his contractually obligated

---

[6]  See, e.g., SBD's Press Release, dated January 27, 2011; SBD's Press Release, dated July 18, 2011; SBD's 2010, Annual Report, filed February 22, 2011.

[7]  In 2010, the Company maintained a performance-based comparison against a defined competitive set including: The Sherwin Williams Company, Cooper Industries, Inc., Newell Rubbermaid, Inc., Snap-On, Inc., Danaher Corporation, Ingersoll-Rand PLC, Masco Corporation, and Illinois Tool Works Inc.

[8]  Subsequent to May 6, 2011, the Special Committee recognizes that SBD stock price can fluctuate with the market. Its closing stock price on October 24, 2011, remained over 17 points higher than on November 2, 2009 and continues to outperform the S&P 500 nearly 2 to 1 since the Merger announcement.

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 9

compensation, the Stanley C&O Committee engaged Mr. England of Towers Perrin to conduct an independent analysis.

Mr. England, engaged by the Company's C&O Committee in July 2011, conducted several market-based analyses of Mr. Archibald's Black & Decker compensation, analyzed market precedent for equity awards for Executive Chairman Agreements, and evaluated the Company's proposed Executive Chairman Agreement. Mr. England concluded that the proposed compensation structure for Mr. Archibald was not unreasonable in light of Stanley's belief that Mr. Archibald was key to the successful completion of the Merger and integration of the combined Company. Mr. Archibald's Executive Chairman Agreement provides that for three years Mr. Archibald shall receive a salary of $1,500,000, with an annual incentive bonus of $1,875,000, and annual equity awards of $6,650,000.[9] Notably, a substantial portion of Mr. Archibald's three-year compensation is tied to his performance in integrating and achieving the projected cost synergy savings of $350 million, for which he may receive a bonus of up to $45 million. The Special Committee also notes that Mr. Archibald waived his entitled severance payment of $20,475,000, as well as a gross up payment if he were subject to the excise tax imposed by Section 4999 of the Tax Code upon completion of the Merger.

Mr. Archibald's compensation is accelerated if he is terminated by SBD without cause or if he terminates his employment as a result of constructive termination. The Executive Chairman Agreement stipulates that reduction in compensation is good reason to resign as Executive Chairman, accelerate his compensation including the cost synergy bonus, and be contractually entitled to as much as $144,772,680 from SBD.

2.   **Stanley Executives' Merger-Related Compensation**

Towers Perrin also offered analysis and advice regarding competitive compensation packages for Messrs. Lundgren, Loree, and Allan at the combined Company. Mr. England evaluated the combined Company's market position and the compensation for executives at peer companies of similar size. The combined Company would become at least twice as large as Stanley. To comport with Stanley's policy to pay-for-performance at the median level of the Company's peer group, Mr. England recommended salary increases of $200,000 for Mr. Lundgren and $140,000 for Mr. Loree. To further align compensation with performance, Mr. England recommended that SBD increase the percentage Mr. Lundgren and other named executives could make in their annual and long-term incentive bonuses.

Towers Perrin also recommended a one-time, Merger-related, special grant of restricted stock units ("RSUs") to Messrs. Lundgren, Loree, and Allan that would evenly vest in the 4th and 5th years after the merger. These one-time grants were recommended and approved by Stanley to retain its core management team.[10] The Stanley C&O Committee believed that the retention of these executives would fully maximize shareholder benefits with the synergies and cost savings associated with the Merger. While primarily retention based grants, the awards are aligned with shareholders' interest because the

---

[9] Mr. Archibald did not receive any merit-based adjustment to his compensation in 2010.

[10] As disclosed in the Company's Say on Pay Proxy, in addition to approving RSU grants to Messrs. Lundgren, Loree, and Allan, SBD's Board also approved a one-time Merger-related RSU grant to Mr. Ansell.

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 10

RSUs value would increase significantly as the Company's stock price increased above the grant date price due to positive performance.

Similar to Mr. Archibald's Executive Chairman Agreement, both Messrs. Lundgren and Loree may accelerate their compensation if SBD terminates them without cause, or if either is constructively terminated *via* a reduction in compensation.

The Special Committee concludes that, based on its independent business judgment, pursuing legal action in connection with the Merger-related compensation for the SBD Executives would not be in the best interest of SBD.  The Merger-related compensation was carefully considered by Stanley's board of directors and the C&O Committee after extensive consultation with its independent, outside consultant, Towers Perrin.  The Special Committee also concludes that the Company, with the assistance of Towers Perrin, aligned the SBD Executives' compensation with performance.   Further, the Merger-related compensation packages were recommended and approved based on valid business considerations, including:

- the alignment of compensation incentives with the Company's annual and long-term performance goals;

- the alignment of compensation with the achievement of synergies and cost savings projected from the Merger;

- the alignment of compensation of the newly combined Company's key executives with the compensation of executives holding similar positions at peer companies; and

- the retention of key executives to ensure proper integration of Stanley and Black & Decker after the Merger.

Particularly important, Messrs. Archibald, Lundgren, and Loree's employment agreements, including one-time Merger-related special awards, were fully disclosed to the Stanley and Black & Decker shareholders in the February 2, 2010 Joint Proxy Statement and were effectively approved by Stanley and Black & Decker's shareholders on March 12, 2010.

If SBD seeks to rescind or otherwise renegotiate these employment agreements, the Special Committee believes that SBD would face a substantial risk of triggering the termination clauses in the employment agreements, and thereby accelerating the compensation paid out to Messrs. Archibald, Lundgren, and Loree.  Moreover, the loss of the Company's core executives, who are integral to the integration of the two companies, would very likely deteriorate investor confidence and would have a significant negative impact on shareholder value.

In light of these factual findings and conclusions, the Special Committee further believes that pursuing legal action against the members of the Board, the SBD Executives, or Towers Perrin would likely be unsuccessful.  After considering all the facts it has obtained during the course of its inquiry, it finds no substantive basis to conclude that viable legal claims could be maintained in connection with the Merger-related compensation.  Additionally, the Special Committee also considered the Merger-related litigation and settlement agreement.  The Merger-related settlement provided a broad release of claims by former

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 11

Black & Decker shareholders (who are now SBD shareholders) that arguably precludes the claims proposed by the Shareholder Litigation Demand for those former Black & Decker shareholders.

### C.     SBD's 2010 Post-Merger Compensation

SBD's executive compensation policy seeks to place a significant amount of its named executives' compensation at risk pending accomplishment of certain performance criteria.  As disclosed in the Company's Say on Pay Proxy Statement, "the amount of compensation realized by our executives is intended to be in the higher ranges of the peer group when performance is strong and in the lower ranges of the peer group when we fail to meet our target performance objectives."  Excluding one-time Merger-related awards, Messrs. Lundgren and Loree's pay opportunity is significantly at risk.  For instance, Mr. Lundgren's long-term incentive target goal is 67% of his total compensation mix and is entirely based on performance over a three-year period.

Annually, SBD's C&O Committee engages a compensation consultant to assess the Company's executive compensation.[11]  In July 2010, the Company engaged Towers Watson to conduct its annual assessment.  Towers Watson performed a market analysis of the Company's executive compensation to determine whether the Company's opportunity is consistent with a size adjusted peer group and whether the Company's compensation is properly aligned with its performance.

In October 2010, Towers Watson presented its assessment to the SBD C&O Committee.  First, Towers Watson recommended that SBD maintain two peer groups to properly assess the Company's executive compensation.  The first peer group would be Stanley's original peer group competitors and would continue to be measured against the Company's performance.  The second peer group, proposed by Towers Watson, included 13 of Stanley's original peer group companies, and added five additional, size appropriate companies.  The second peer group would better reflect SBD's increased size.  SBD approved Towers Watson's recommendation and now maintains two peer groups to more accurately analyze the Company's executive compensation and relative performance.

Second, Towers Watson found that SBD's pay opportunity compared to its size adjusted peer group was aligned with the median market practice for the executives with significant pay opportunity tied to long-term incentives.  Towers Watson assessment indicated that SBD's top executives – Messrs. Lundgren, Loree, Allan, and Ansell – base salaries were 1% above the median, whereas target total cash (base salary and target annual bonus) was 2% below the median.  Alternatively, the Company's long-term incentive values for the top executives were 12% above the median, indicating the Company's preference to pay its executives for long-term success.[12]

---

[11] The Company's C&O Committee annually reviews executive compensation with the assistance of an independent expert, and subsequently makes recommendations to the Board regarding merit-based adjustments for individual executives.

[12] Towers Watson noted that Mr. Loree's compensation package was above the median level for executive vice presidents in the Company's general industry.  SBD's C&O Committee requested that Towers Watson perform an additional analysis to better reflect Mr. Loree's position as Chief Operating Officer and the second highest paid executive at SBD.  In November of 2010, Towers Watson presented

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 12

Third, Towers Watson found that SBD's Executives realized pay was strongly aligned with the Company's performance relative to its peer group. Towers Watson compared the relationship between SBD's pay and performance to the 2009, pre-Merger compensation and the performance-based peer group to draw an accurate comparison with the Company's pre-Merger operations. Towers Watson concluded:

- total shareholder return of 4% was in the 96th percentile of the peer group;

- despite a decline of 19% EPS over the three-year period, it still was in the 56th percentile of the peer group;

- operating cash flow growth of 23% was in the 45th percentile of the peer group;

- average return on capital employment of 13% put the Company in the 86th percentile of the peer group;

- the average of the above performance indicators placed SBD in the 85th percentile of the peer group for overall composite performance; and

- realizable pay for the top five SBD executives was in the 82nd percentile of the peer group.

The Company's C&O Committee determined, based upon Towers Watson's independent analysis, that Messrs. Loree, Allan, and Ansell would receive merit-based salary adjustments that when approved, would be implemented in the summer of 2011. Notably, Messrs. Lundgren and Archibald did not receive any merit-based adjustment to their salary that was set at the Merger.

The Special Committee concludes that, based on its independent business judgment, the factual findings do not support pursuing legal action in connection with the SBD's Executives' non-Merger-related compensation. Towers Watson provided the C&O Committee thorough and detailed advice with respect to a size-adjusted peer group appropriate for the newly combined Company, assessed the Company's realized pay against performance, provided additional analysis regarding Mr. Loree's compensation, and prepared a recommended action plan for the Company. Further, the Special Committee found no evidence to suggest that Towers Watson provided the C&O Committee with less than sound, competent advice with respect to each of these matters or otherwise aided and abetted in a breach of fiduciary duty by any Board member. *See Teamsters Local 237 Additional Security Benefit Fund v. McCarthy*, Civil Action No. 2011-cv-19781 at 11 (Ga. Super. Sept. 16, 2011) (finding that a shareholder did not have valid derivative claims against a compensation consultant for aiding and abetting a breach of fiduciary duty or breach of contract in connection with approving allegedly excessive executive compensation).[13]

---

an updated market analysis and found that Mr. Loree was compensated near the median for chief operating officers and the second highest paid executives at fortune 500 companies.

[13] As a result of the Special Committee finding that the 2010 executive compensation aligned with the Company's pay-for-performance policy, the Special Committee has determined that there were no misleading statements or omissions in connection with the Say on Pay Proxy.

PAUL
HASTINGS

Travis E. Downs III
Benny C. Goodman III
Robert B. Weiser
Katharine M. Ryan
Eduard Korsinsky
Douglas E. Julie
October 25, 2011
Page 13

      **D.**    **Additional Considerations Also Support Rejecting the Shareholder Litigation Demand**

After assessing the factual circumstances surrounding the Board's 2010 executive compensation decisions, the Special Committee has determined that the Board properly exercised business judgment as reflected by the C&O Committee's careful consideration of executive compensation matters in 2009 and 2010, including its reliance on independent outside consultants.

Further, any suit against any member of the Board, the SBD Executives, or Towers Watson/Towers Perrin would not justify the expense of litigation. SBD would be obligated to provide a defense to defendants in a derivative action, subject to the right of recoupment, if it is ultimately determined that they were not entitled to indemnification.

Finally, the Special Committee also determined that a lawsuit against any members of the Board, the SBD Executives, or Towers Watson/Towers Perrin may dampen SBD's shareholder value, could result in the resignation of key personnel vital to the successful integration of the combined Company, and it would very likely divert Board members' and SBD management's attention from executing SBD's important business objectives at a critical juncture in the combined Company's existence.

**VII.**    **CONCLUSION**

The Special Committee finds that the Company's 2010 executive compensation was strongly aligned with the Company's performance in accordance with the Company's pay-for-performance policy. Despite a difficult and volatile economic environment in 2010, the Company performed well relative to the overall market and its peer group. The Special Committee concludes that bringing legal action against any members of the Board, the SBD Executives, or Towers Watson/Towers Perrin would be unlikely to succeed on the merits. The Special Committee found no evidence to support a claim that (i) any Board members breached their fiduciary duties owed to SBD, (ii) any SBD Executives could be found to have been unjustly enriched, or (iii) Towers Watson/Towers Perrin aided and abetted breaches of fiduciary duties or breached its contract with SBD.

We trust that the Special Committee's reasonable inquiry and above referenced factual findings sufficiently lead you to conclude that it is not in best interest of the Company to pursue any legal action. If you would like to discuss this matter further, please let us know as we will be happy to discuss the Special Committee's findings.

Sincerely,

William F. Sullivan
of PAUL HASTINGS LLP